## DECLARATION OF LAURA STEINBACH

I, Laura Steinbach, Special Agent with the Federal Bureau of Investigation ("FBI") do hereby declare:

### I. Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the FBI Baltimore Field Office, where I investigate complex financial crimes. I have been employed as an FBI Special Agent since August 2014. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. Prior to becoming a Special Agent, I was employed with the FBI as an Intelligence Analyst.

2. I have attended the training course for FBI Special Agents at Quantico, Virginia. I have been trained in the requirements for probable cause. I have training and experience in the enforcement of the laws of the United States, including training in the preparation and execution of search and seizure warrants. Over the course of several investigations, I have consulted with cyber professionals in the law enforcement field regarding criminals' use of computers, email, mobile phones, and cryptocurrency in conjunction with financial fraud and other criminal schemes.

3. I have been the Affiant on multiple complaints and search and seizure warrants, as well as assisted in the preparation and/or execution of numerous arrest, search, and seizure warrants. Through my training and experience, I have become familiar with the methods and techniques used by criminals to commit various crimes, such as aggravated identity theft and fraud, and how those criminals conceal and store proceeds derived from such criminal activity, including through the use of cryptocurrency.

1

## II. Purpose of this Declaration

4. This declaration is submitted in support of a complaint for forfeiture *in rem* of virtual currency funds (commonly referred to as "cryptocurrency") seized from and account with User ID XXXX3527 held at virtual currency exchange Binance in the name of R.J.[1] on or about June 14, 2022 (the "TARGET ACCOUNT").

5. I submit that there are sufficient facts to support a reasonable belief that the TARGET ACCOUNT constitutes proceeds of a conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 1343, and/or constitutes property involved in a money laundering conspiracy in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).

## III. Summary of the Investigation

### A. Background on Relevant Cryptocurrency Entities and Concepts

6. Bitcoin (BTC) is a "cryptocurrency," also known as "virtual currency." Cryptocurrencies are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency

---

[1] Because this account holder is not currently the subject of federal charges, only the account holder's initials are used.

2

transactions. Secret keys are typically only shared with the owner of the address.

7. Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public—they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

8. Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraud suspects will use cryptocurrency exchanges to store, launder, and obfuscate their illicit gains.

**B.    The Investigation**

9. The FBI is investigating the loss of money that was fraudulently obtained from Victim 1 and Victim 2 (collectively known as "the Victims"). The Victims are an elderly married couple who reside in Adelphi, Maryland. On August 7, 2020, Victim 1 received a phone call on their home phone line from a fraudster using the name Don Harvey ("Harvey"). Harvey told Victim 1 that he was an employee of Capital One Bank, and an ATM debit card that belonged to the Victims was compromised/hacked. Harvey told Victim 1 that on July 27, 2020, a wire transfer to Hong Kong for $699.99 was made with the Victims' compromised ATM debit card. Harvey also told Victim 1 that Victim 1's Visa Credit Card initiated a charge of $399.99 on the same day as the wire transfer to Hong Kong, and Victim 1's Social Security Number was unsuccessfully used to apply for a $10,000.00 loan. The Victims did not review their account activity at the time

to confirm the wire transfers. Several months later, FBI agents reviewed the Victims' financial statements from Capital One Bank and there was no record of wire transfers similar to the transfers Harvey described.

10. Harvey told Victim 1 that he had a working relationship with the FBI, and he instructed Victim 1 to send an e-mail to fbiheadquarters@usa.com[2] and provide Victim 1's Social Security Number, mailing address, phone numbers, and Capital One account numbers. Victim 1 complied and sent the requested information to fbiheadquarters@usa.com on August 7, 2020 and received a confirmation response from fbiheadquarters@usa.com within the hour. During a phone call on August 12, 2020, Harvey told Victim 1 someone gained unauthorized access to Victim 1's online account at Capital One Bank, and as a result of this "unauthorized access," the FBI had blocked Victim 1's online bank account. In reality, the FBI had not taken any action.

11. Harvey stayed in continuous contact with the Victims during the month of August 2020. Harvey made claims to the Victims that hackers made repeated attempts to gain access to the Victims' bank accounts. On August 17, 2020, Harvey put Victim 1 in contact with another apparent fraudster who identified himself as Roy Lair ("Lair"), and claimed to be an employee of Capital One Bank. At a later date, Victim 1 was put in contact with yet another apparent fraudster who claimed to be named John Matthews ("Matthews"), and falsely represented that he was an employee of the FBI.

12. The FBI reviewed phone call logs and text messages (including content of the text messages) between Victim 1 and Lair. Victim 1 and Lair were in contact multiple times a week

---

[2] fbiheadquarters@usa.com is an email address hosted by 1 & 1 Mail & Media, Incorporated. An email address utilized by the FBI would have an email domain of "fbi.gov". A Grand Jury Subpoena return from 1 & 1 Mail & Media revealed that fbiheadquarters@usa.com was registered on 01/25/2020 with the account holder name of "Federal Bureau" and alternate email address of ggfhgh@gmail.com. 1 & 1 Mail & Media, Incorporated produced their subpoena response on 2/23/2021; as of that date, fbiheadquarters@usa.com was last accessed by a user on 8/07/2020.

4

from August 2020 through December 2020. Based on a review of the text messages and Victim 1's recollection of events, Lair informed Victim 1 that the Victims' money needed to be moved to secure accounts to prevent the hackers from gaining access to the money. The Victims provided Lair with their personally identifiable information and pictures of their driver's licenses, passports, and home utility bills. The Victims sent this information to the fraudster because they believed it would help them to obtain new Social Security Numbers and secure their money.

13. Information obtained by a Grand Jury Subpoena to Prime Trust LLC[3] confirmed that the fraudsters used the Victims' personally identifiable information and the pictures of the documents Victim 1 sent Lair to open accounts at Prime Trust LLC in Victim 1 and Victim 2's names[4]. The Victims reported to the FBI they were aware that some of their money was sent to Prime Trust LLC through bank wires, but the Victims did not establish accounts at Prime Trust LLC. The Victims wired money to Prime Trust LLC as an attempt to secure their money based on instructions from the fraudsters.

14. At Lair's direction, the Victims reallocated their funds from retirement accounts and other bank accounts to their accounts at Capital One Bank and Educational Systems Federal Credit Union. From August 31, 2020, to October 6, 2020, three transfers were made from the Victims' account at Educational Systems Federal Credit Union (ESFCU) to the accounts established in Victim 1's name at Prime Trust LLC totaling $750,000.00. From August 20, 2020, to December 29, 2020, six transfers were made from the Victim's account at Capital One Bank to the accounts established in Victim 1's name at Prime Trust LLC totaling $698,000.00.

15. Victim 1 reported to the FBI that Victim 1 was instructed to purchase a new

---

[3] Prime Trust LLC is a trust company based out of Summerlin, Nevada that specializes in the use and investment of digital assets such as Bitcoin and other cryptocurrencies.
[4] Two accounts were opened in Victim 1's name, and one account was opened in Victim 2's name, however funds were only deposited into the accounts in Victim 1's name.

cellphone on August 27, 2020, and to download multiple applications to this cellphone that facilitated buying, selling, and transferring cryptocurrencies. After Victim 1 conducted the above wire transfers to the Prime Trust LLC account, Lair instructed Victim 1 to convert the money to Bitcoin. The funds were converted to Bitcoin in cryptocurrency accounts at Binance.US[5] and Abra[6]; these accounts were in the name of Victim 1. Then at Lair's direction, Victim 1 transferred/withdrew the Bitcoin to other cryptocurrency accounts that were *not* under the control of the Victims. The FBI has reviewed text messages from Lair to Victim 1 with directions on how to convert the funds to cryptocurrency and addresses of where the cryptocurrency should be transferred to. The FBI also viewed screenshots that Victim 1 took of his/her phone of confirmations that the movement of the Bitcoin was successful. Victim 1 sent those confirmation screenshots to Lair. The Victims thought their money was being secured in Bitcoin accounts, and the money would be returned to them after they obtained new Social Security Numbers and secure bank accounts.

16. Victim 1 reported to the FBI that on December 29, 2020, after all the money was transferred to cryptocurrency accounts, Lair instructed Victim 1 to erase the memory and contents of the cellphone Victim 1 purchased on August 27, 2020. Victim 1 complied with the request, but then contacted the cellphone manufacturer to retrieve the contents of the phone Victim 1 had just erased. On January 4, 2021, the Victims determined they were defrauded of their money and contacted law enforcement.

---

[5] Binance.US is a cryptocurrency exchange based out of San Francisco, CA. Binance.US utilizes technologies from Binance.
[6] Abra is an investment application used to deposit and withdraw cryptocurrency. Abra is headquartered in Mountain View, CA.

Tracing Bitcoin from Victim 1 to the TARGET ACCOUNT

17. $788,000 of the funds Victim 1 sent to Prime Trust LLC then went to the cryptocurrency exchange Binance.US. In response to a subpoena, Binance.US provided records for Victim 1's Binance.US account. Binance.US records showed that the $788,000 of Victim 1's funds were deposited into Victim 1's Binance.US account, where they were then converted into 67.43[7] BTC.

18. In addition, $660,000 of the funds Victim 1 sent to Prime Trust LLC went to the cryptocurrency exchange Abra. In response to a subpoena, Abra provided records for Victim 1's Abra account. Abra records showed that the $660,000 of Victim 1's funds were deposited into Victim 1's Abra account, where they were then converted into 49.05 BTC.

19. Of the 67.43 and 49.05 Bitcoin in Victim 1's Binance.US and Abra accounts, respectively, a total of 109.81 bitcoin was withdrawn at Lair's direction to Bitcoin addresses he provided to Victim 1 and that were not controlled by Victim 1. The FBI viewed text messages Lair sent to Victim 1 that contained addresses for where the bitcoin should be sent. These transactions are depicted in the following table:

| DATE | AMOUNT (BTC) | SOURCE | DESTINATION |
|---|---|---|---|
| 8/26/2020 | 8.24 | Victim 1 (Binance.US) | 1J5d2p1ijMr2PSdeesyXC1Qn1K6cn4gS61 ("**Address 1**") |
| 8/28/2020 | 8.64 | Victim 1 (Binance.US) | **Address 1** |
| 8/29/2020 | 8.67 | Victim 1 (Binance.US) | **Address 1** |
| 8/30/2020 | 8.55 | Victim 1 (Binance.US) | **Address 1** |
| 8/31/2020 | 4.23 | Victim 1 (Binance.US) | **Address 1** |

---

[7] Unless indicated otherwise, all virtual currency amounts in this affidavit have been rounded to the nearest 0.01.

| Date | Amount | Victim | Address |
|---|---|---|---|
| 9/1/2020 | 4.27 | Victim 1 (Binance.US) | **Address 1** |
| 9/1/2020 | 0.85 | Victim 1 (Binance.US) | **Address 1** |
| 9/1/2020 | 7.64 | Victim 1 (Binance.US) | **Address 1** |
| 9/1/2020 | 0.85 | Victim 1 (Binance.US) | **Address 1** |
| 9/1/2020 | 12.72 | Victim 1 (Binance.US) | **Address 1** |
| 9/22/2020 | 9.00 | Victim 1 (Abra) | 1JHPXxkQkzuzwBDV35Qj6crbCEreJ1Fp1K ("**Address 2**") |
| 9/24/2020 | 9.50 | Victim 1 (Abra) | 1Aky9gVWtvYTezEq1TTaiYhszQWt7H8r5y ("**Address 3**") |
| 10/13/2020 | 8.50 | Victim 1 (Abra) | 18fEh1KVzcv6c3QTKfjH3CLF5ocppdx5UJ ("**Address 4**") |
| 10/15/2020 | 8.70 | Victim 1 (Abra) | 1LGrK2xcKhXsE5NGmWgBqGzerPoBhmA2R5 ("**Address 5**") |
| 12/10/2020 | 4.90 | Victim 1 (Abra) | 19cGHpesKbeqB5cqH1M5qGjqBAxS4wsYiC ("**Address 6**") |
| 12/29/2020 | 2.20 | Victim 1 (Abra) | 1Ln6ncU2mW5oZKG8WyvvYsnwZYijHAeGV3 ("**Address 7**") |
| 1/1/2021 | 2.35 | Victim 1 (Abra) | 1LqJqQXK9Aznw47f4wV4itdF6N57z97Uyi ("**Address 8**") |

20. A tracing analysis was conducted on the Bitcoin in the addresses in the table above using a commercially available proprietary software tool that analyzes transactions on the Bitcoin blockchain. The software identified a group of 11 addresses that were controlled within one Bitcoin wallet ("**Wallet A**"). **Address 1, Address 6,** and **Address 7** were included in **Wallet A**, a private wallet not held by any exchange. With the exception of 10.00 BTC that was sent to the **TARGET ACCOUNT** in November 2020[8], all of the Bitcoin from the table above in **Address 2, Address 3, Address 4, Address 5,** and **Address 8**, was consolidated into **Wallet A** in the transactions listed

---

[8] The 10.00 BTC was sent to the **TARGET ACCOUNT** at Binance on 11/29/2020 as part of the same transaction involving **Address 9** and **Address 10** in the table below. In other words, 9 BTC went from Address 2 to Wallet B on 9/23/2020 and 9.5 BTC went from Address 3 to Wallet B on 9/24/2020 for a total of 18.5 BTC; of that 18.5 BTC, 10 BTC went to the **TARGET ACCOUNT** on 11/29/2020 and 8.5 BTC went to Wallet A on 11/29/2020.

in the following table:

| DATE | AMOUNT (BTC) | SOURCE | DESTINATION |
|---|---|---|---|
| 9/23/2020 | 9.00 | Address 2 | 14AmXjEJYREaPxEntKxkGbbsNKMF6AF8kC ("**Address 9**") |
| 9/24/2020 | 9.50 | Address 3 | 1A7zrHCGrHWzSzrQtfCnHKeR9C7c2G3Yd7 ("**Address 10**") |
| 11/29/2020 | 8.50 | Address 9 & Address 10[9] | Wallet A |
| 10/15/2020 | 8.50 | Address 4 | Wallet A |
| 10/16/2020 | 8.70 | Address 5 | Wallet A |
| 1/2/2021 | 2.35 | Address 8 | Wallet A |

21.     A further tracing analysis of the withdrawals of the BTC in the tables above from **Wallet A** showed that 10.00 of the BTC ultimately ended up being deposited at Binance on February 28, 2022, through the series of transactions in the following table:

| DATE | AMOUNT (BTC) | SOURCE | DESTINATION |
|---|---|---|---|
| 12/31/2020 | 48.45 | Wallet A | 14Pm6h5Ex1J7F3MmkcXZuX3aoJ8UuNmU98 ("**Address 11**") |
| 12/31/2020 | 48.45 | Address 11 | 17F3VSFWTnSoFA4ZRmTSWBooK2cmTWzD3G ("**Address 12**") |
| 10/2/2021 | 47.45 | Address 12 | bc1q2upv27yhggyuhemyndn404v80lz3jgnqr6epp7 ("**Address 13**") |
| 10/24/2021 | 49.80 | Address 13 Address 15[10] | bc1qc9m27t5n8al40ft9geguxrmm32ykr9scma4p59 ("**Address 16**") |
| 11/12/2021 | 48.80 | Address 16 | bc1qnehx9hv38jp2eqnhtp4kx35wswvlt7vfnz87n0 ("**Address 17**") |
| 1/23/2022 | 47.80 | Address 17 | bc1qmfy6jtrjlf39mzkjypnysgjxqwycl2qeau7lhk ("**Address 18**") |

---

[9] The aforementioned software identified that **Address 9** and **Address 10** were within the same Bitcoin wallet, Wallet B, a private wallet not held by any exchange.
[10] 2.35 BTC was sent from **Wallet A** to 1J2yq4HaMZ3nkso7br3yYntd8ybX5j1hGF ("**Address 14**") on 1/2/2021. 2.35 BTC was then sent from **Address 14** to 1GWMaGiHRAohBTjAGa7c916epJ6psuzEPo ("**Address 15**") on 1/2/2021. The aforementioned software identified that **Address 13** and **Address 15** were within one Bitcoin wallet.

| | | | |
|---|---|---|---|
| 1/25/2022 | 46.80 | **Address 18** | bc1qc06l8tp4gx70yk8nesljc8fh5mt0m7633v2lqq ("**Address 19**") |
| 1/28/2022 | 45.80 | **Address 19** | bc1q0r99khd2pwpdnlqw7gax9ps6haldfeusx0jl8k ("**Address 20**") |
| 1/30/2022 | 44.80 | **Address 20** | bc1qr0fa6mtqg7ytygznyav3eym6fw6kg9mt0uxm2e ("**Address 21**") |
| 1/31/2022 | 43.80 | **Address 21** | bc1qxkuzfk3xugs93z3m3l3f2yd2jy2z04jkqf2gkp ("**Address 22**") |
| 2/28/2022 | 10.00 | **Address 22**[11] | **TARGET ACCOUNT** 16z3VojsBXEwGCX6ktpZG7m9hxwGufi5B2 |

22.   The tracing analysis indicated that the **TARGET ACCOUNT** was held at Binance. On January 13, 2022, the FBI emailed Binance at case@binance.com to provide a signed Letter Head Memorandum to Binance requesting records on the **TARGET ACCOUNT**. In response to the official records request, Binance provided customer information associated with the **TARGET ACCOUNT**, including that the account was registered on March 24, 2020, in the name of R.J. The registration information also included a date of birth, email address, phone number, and physical address in India for R.J.[12]

23.   According to Binance records, as of January 14, 2022, a variety of different virtual currencies were held in the **TARGET ACCOUNT**, with a total approximate value of $367,039.85 (using approximate values as of March 03, 2022).

24.   On February 28, 2022, the FBI emailed Binance at case@binance.com to provide a signed Letter Head Memorandum to Binance requesting records on the **TARGET ACCOUNT** as well as requesting for Binance to voluntarily freeze the funds in the **TARGET ACCOUNT** pending service of legal process. On March 3, 2022, Binance confirmed the funds in the **TARGET ACCOUNT** were frozen and that approximate value of all the cryptocurrency in the **TARGET**

---

[11] As part of this transaction, 33.80 BTC was sent from **Address 22** to bc1q004ml5edszceqax29vnc3mrs8awjt9lmhsc8h8 ("**Address 23**"), where it remains unspent as of 3/2/2022.
[12] As noted above, because R.J. is not currently the subject of federal criminal charges, identifying information is being withheld.

**ACCOUNT** was $777,016.07. On February 28, 2022, the date the **TARGET ACCOUNT** received 10.00 BTC, 10.00 BTC had an estimated value of $405,050.30. Based on my training and experience, I know that the value of cryptocurrency fluctuates and that wallets used for money laundering may gain and lose value with various deposits and transfers that aid in concealing proceeds of crime.

25. As of October 11, 2023, the **TARGET ACCOUNT** had a balance of approximately $393,554.

26. Based on my training and experience, I believe the **TARGET ACCOUNT** is being used as a money laundering platform to launder the proceeds of the fraud committed against the Victims. Based on my training and experience, I know that fraud suspects prefer payments from their victims be paid in the form of Bitcoin or other virtual currencies in order to transfer funds from a place in the United States to or through a place outside the United States. I also know that fraud suspects take extra steps, known as layering, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds by transferring them through multiple accounts, wallets, and/or cryptocurrencies that serve no business or financial purpose to try to distance them from their criminal sources.

## CONCLUSION

27.     Based on the forgoing, I submit that there is probable cause to believe that all of the funds held in the **TARGET ACCOUNT**, in any form, are proceeds of, or traceable to proceeds of violations of 18 U.S.C. §1343 (Wire Fraud), and/or are involved in violations of, 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), and 982(a)(1) (criminal forfeiture), and 18 U.S.C. § 981(a)(1) (civil forfeiture).

*Laura J. Steinbach*
Special Agent Laura Steinbach
Federal Bureau of Investigation